■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE ARABADJIS, Appellant.—Judgment, Supreme Court, New York County, rendered March 21, 1978, convicting defendant after a jury trial of murder in the second degree and sentencing him to an indeterminate sentence of from 15 years to life, reversed, on the law, and matter remanded for a new trial. The People introduced evidence tending to prove that defendant Arabadjis and an accomplice, Ronald Roucchio, had murdered a cab driver, Richard Kornblatt, on April 13, 1977. In support of its case, the People presented an incriminatory statement made by the defendant to the detectives after his arrest. At trial, the defendant testified that he was asleep at home at the time of the occurrence. He also stressed that the officers had given him several glasses of scotch to drink before he signed the written statement. The defendant further stated that he had not read the statement when he signed it. A prosecution witness, Leonard Patton, corroborated the defendant's testimony that the detectives had given him several glasses of scotch before taking his written statement. The detectives denied that they had given any scotch to the defendant or to any of his associates. Thus, a sharp factual issue was presented for the jury as to whether the defendant had

involuntarily signed the statement while under the influence of alcohol. A Trial Judge in criminal matters may take an active part in the examination of witnesses where questioning is necessary to elicit significant facts, to clarify or enlighten an issue or merely to facilitate the orderly and expeditious progress of the trial. However, because of the ever present and serious threat that a jury's determination may be influenced by what it interprets to be the court's own opinion, this prerogative should be exercised with caution. Consequently, it is error for a Trial Judge to ask many rhetorical questions that indicate a communicable disbelief in the testimony of particular witnesses. *(People v Mendes,* 3 NY2d 120, 121.) During the redirect examination of Patton, the trial court questioned him at length about the "drinks" that were allegedly given to the defendant by the detectives. As the following excerpt indicates, the trial court's questions reveal that it was very skeptical of Patton's testimony in this regard. "THE COURT: While you are gathering your thoughts. When you were questioned by the police you never said to them, 'I saw you give George Arabadjis drinks,' did you? THE WITNESS: Excuse me? THE COURT: The *[sic]* you ever tell the police on April 13th or 14th, when you saw them, that you saw them give George Arabadjis drinks? THE WITNESS: No. THE COURT: When you spoke to the assistant district attorney on April 14th did you tell her that you saw the police give George Arabadjis drinks? THE WITNESS: No. THE COURT: When you testified in the grand jury did you say anything about giving George Arabadjis drinks? THE WITNESS: No. THE COURT: What was discussed between you and George Arabadjis when you visited him at Riker's Island at Christmastime? What did George Arabadjis say to you and what did you say to him? MR. BERNHEIM: Your Honor, I respectfully object. THE COURT: Overruled. THE WITNESS: We talked about my family. We talked about how I was doing; why I hadn't come up to see him, and if I was going to testify. THE COURT: Tell us what he said to you and what you said to him concerning your testimony? THE WITNESS: He told me he didn't do it. THE COURT: Was any discussion had concerning the fact that he had received the drinks at the police station? THE WITNESS: No, sir. THE COURT: No conversation at all? THE WITNESS: No, sir. THE COURT: when you spoke yesterday to Mr. Bernheim, did Mr. Bernheim ask you at that time whether or not George Arabadjis had received any drinks at the stationhouse? THE WITNESS: Yes. THE COURT: Who brought that up? Did Mr. Bernheim bring that to you, or did you bring that up to Mr. Bernheim? THE WITNESS: He brought it up to me. Your Honor— THE COURT: Who told you that there were five drinks given to George Arabadjis? Did he state that to you first, or did you state that to him? THE WITNESS: I stated it to him. THE COURT: Did he bring up the question of drinks? THE WITNESS: Yes, your Honor. Can I". The trial court's skepticism in this matter continued during the testimony of the defendant. The trial court's disbelief in the defendant's alleged inebriation surfaced subtly but clearly in the following exchange with the defendant: "THE COURT: How many drinks did you have? THE WITNESS: To tell you the truth, I don't remember the exact amount. THE COURT: Each time you had a drink, you went into the bathroom and got water with it? THE WITNESS: Well, maybe not each time, no. I know the first time, I did, yes, because I'm not a scotch drinker. THE COURT: You weren't a scotch drinker on the second, third or fourth occasions, either? THE WITNESS: No, but the second, third and fourth occasion makes it a little easier, too". The trial court expressed further doubts as to the veracity of the defendant's account in the following question: "THE COURT: How did you know what was in the statement if you didn't read it and you didn't give it to Detective Scarcella? How would you

know what to say to the DA if you didn't read that statement and—THE WITNESS: Because I was told a good majority of what to say, that he said that he got from John Gagliano". From time to time, the trial court continued to interject itself in this same vein during the testimony of other witnesses. For example, it elicited from Detective Finelli that, in his 23 years in the police force, he had never seen liquor served to a defendant in a station house. This type of "slanted" questioning by the trial court unfairly buttressed the People's case in this crucial area. In sum, the trial court persisted in the use of rhetorical questions to show its disbelief in the testimony tending to prove that defendant's written statement was given involuntarily. The trial court's interrogation in this regard negated testimony that was crucial to the defense; it necessarily weakened the defendant's over-all credibility in the eyes of the jurors. This pervasive error deprived the defendant of a fair trial and it warrants a reversal and the grant of a new trial. *(People v Mees,* 47 NY2d 997; *People v Carter,* 40 NY2d 933.)* Concur—Murphy, P. J., Ross, Markewich, Silverman and Lynch, JJ.